May it please the Court, Counsel for the Governor, my name is Joel Androfian, my co-counsel is to impute the SBA's responsibility to investigate and vet 8A companies onto Col. Harris when he had no contractual or statutory duty to do the SBA's job. I think it's pretty clear in this case that the SBA has that ultimate responsibility in this government program. In other words, these defendants don't have any responsibility for this, they took the money, there was no performance by the minority business owner here, and the argument sounds very much like, well, the government's responsibility here was to police this, and they didn't do it, and they should have caught them earlier. I'm just saying that's the counter-argument to that. That is the argument, Judge. This is a government charity type of program, and the government has a job to do to investigate, they have a job to do to monitor and audit these companies, and the SBA did not do that job. It's not incumbent upon Col. Harris to do the SBA's job for them. He had no duty to report even the failings of Tropical, the company, or the 8A company, and to impose that duty and responsibility on Col. Harris would be unjust. It's the government, when they establish these programs, they establish these programs so that they should work, and there's good intentions to do these programs, but as even the District Judge remarked, and the U.S. Attorney remarked during the case, there's an extraordinary amount of corruption at the SBA, and that's why these programs don't work in part. But the question that I thought this morning that I would engage the court with is, does this automatically mean that somebody should have a free pass because the government didn't do their job? And the answer is no, of course not. I think each case needs to be looked at on its own merits, but there should never be, there should be a presumption because the government does their vetting and approves the 8A, especially in this case. What should the government have done that it didn't do? They should have, the SBA, the SBA should have done audits of this company, yearly audits. They should have employed more people to assist Mr. Mondo, who apparently was not. What would the audit have shown? The audit would have clearly shown that Tropical was not doing the work. If the government had done an audit, it would have disclosed that Tropical could never have performed on this contract. Well, I think they could have performed, Your Honor. They did on, there was three contracts in this joint venture. On one of the contracts, the TW, the Water Commission contract, they did do 100% of the work. So it was clear that Ms. Winters was capable of performing. She just didn't want to perform because she didn't want to spend the money for employees. She could do, the work wasn't of a technical care, something that she could lack the technical expertise. It's that who was going to hire the workers, right? Yes, she was basically cheap. She didn't want to spend the money to do the work here. How much money did she get out of this? She got 51% of the profits. She got her fair share of the profits, but she didn't do the 40% of the work. Now, how does that 40% work? Miss, that was a question Mr. Harris seemed to have. Does it have to be 40% as you go constantly or is it 40% on the overall? What's, you know how he said, do they have to be doing the work as they go or as long as they do some work at some point? How does that calculate? What's the legal answer to the question? I think, Your Honor, it was my understanding it's over the life of the contract. Each particular deal or the whole joint venture? Each particular contract in the joint venture. So in this situation, for example, in this joint venture, there was the Galveston contract, there was the IBWC contract, and then there was the Fort Bliss contract. Is there any evidence that one contract doesn't have a misrepresentation or that he wasn't involved in it? Is it, does it have to be all of, is one good enough or if one's bad, does it have to go back? Do you see what I'm saying? I think each contract, I understand Judge O'Rourke. I think each contract stands on its own merits. So if we find that, just assuming argument knowing this, I'm certainly not foreshadowing, that one of them did not have the requisite false misrepresentation, false representation, then what, does that mean that the sentencing was wrong or what happens? I think at that point in time, you're going to have to look at it on a count-by-count basis. That, for example, let's assume that the Galveston contract, there was nothing nefarious about the Galveston contract, that any of the invoices and monies paid by the government under the Galveston contract would not be false, would not be fraudulent. Then you would go look at the Fort Bliss contract. I don't think, I think they stand on their own merits. They're not integral. But do you lose your case if any one of the contracts stands or do you get something if we find that one contract doesn't stand, doesn't make, you don't know? I would think that for me to survive here or for Colonel Harris to get a complete reversal, both contracts would have to be, we'd have to withstand both contracts because the counts relate to different contracts here. There's some counts that relate to the Galveston contract and there's some counts that relate to the Fort Bliss. I think she was also asking about sentencing, I think. I'm sorry, Your Honor? I think she was also asking about sentencing. Right. If the sentencing is calculated on the total loss amount and one of the contracts is not, doesn't have misrepresentation, false representations, then would it have to be sent back for resentencing because the total loss amount's wrong then? Yes. In this circumstance, yes. I'm sorry, I misunderstood. Okay. Yes, it would have to go back for resentencing because of the 16-level adjustment that the court made when the court sentenced Colonel Harris. But going back to the Ms. Winters had three joint ventures going on. She was granted three joint ventures within one week by the Small Business Administration. Let me be clear with that. In what manner did she perform? What did she do? In Tropical. What did Tropical do in any of these deals? Very little. Very little. Did they do anything? No. They did zero work, and that was reported. That was reported to the government. That was from the very beginning to the very end. Tropical never did anything. No. And then you had to look at this payment schedule at $60,000, $60,000, $60,000. These government payments are just flowing out there, and she's doing nothing. Now, maybe at the outset, my question is what could a jury have concluded based on this evidence? Was there a scheme to defraud? There's an argument here that this man didn't intend to defraud the government, that his minority partner just didn't perform. I understand that argument. The question is what is the evidence from which a jury can conclude? You agree that is the issue? Yes, Your Honor. All right. I'm trying to be clear about exactly what happened. Tropical here did nothing and received, I don't know how much the money was, 40% of what that translates to in dollars, but how much money did they take down for doing nothing? Fifty-one percent of the profits. How much is that approximately? I don't recall the exact dollar amount. Well, it's a dollar money. But she didn't perform from the very beginning. Correct. That's right. And how long a period of time did this contract go on? Well, the Galveston contract was cut short after 15 months. It was supposed to be a three-year contract. What's the total span of this scheme, alleged scheme? For just the Galveston contract, it would have been three years, but it only lasted 15 months, and then you went on to the IVWC contract, and then you went on to the Fort Bliss contract. So you have over a year and a half, two-year period of time in which the minority participant is doing nothing and being paid. Yes. All right. And you say that, but what representations, if any, does the record show that our defendant here, Harris, is made in that regard? Well, Colonel Harris put together the templates to report to the government contracting officers that Tropical was not doing their work. Colonel Harris worked for Luster. He was not capable of getting Tropical to perform. Well, that's not my question. My question is, what was Harris communicating to the government about her performance during that nearly two-year period in which she did nothing and was being paid? Colonel Harris was not communicating with the government. He had no obligation to communicate with the SBA. I'm not talking about obligation. What did he tell them, if anything? You say he said nothing, but it was the government's problem to find out. Yes, sir. I'm not trying to put that in a particular way, but that sounds exactly like what you're saying. He didn't tell them anything because he wasn't obligated to. Correct. All right. So that sounds like, catch me if you can, maybe that's not a crime here because you're relying on the fact that the government could not – there's no evidence to find a scheme. Correct. It's not a crime, Your Honor, to report to the government about what they should be doing themselves. It's not Colonel Harris's job to vet the SBA's responsibilities. It's the SBA that sets the program up, and it's their job to determine whether or not somebody is complying. But Colonel Harris went above and beyond that by putting together templates and even arranging for the invoice packets that went to the government to reflect that Tropical was doing zero work. He didn't send that to the government, right? Well – His bosses or the principals didn't send that in. He said he didn't send it, but the people said that they got it. And the contracting officer said that they would have required the backup information, and the backup information reflected zero work. But assuming for a minute – It would be truthful information if he gave anything. Yes. And he had available information if there was audits. And even the employee for the joint venture testified that if somebody came to his offices, they would have seen the records and the files reflecting zero work by Tropical. And that template was initiated and prepared by Colonel Harris. Now, was he even a principal on the Galveston Project contract? I mean, he wasn't – He was a program manager. He didn't sign the Galveston Project contract, right? He didn't sign the joint venture, I think. He didn't sign the joint venture, and he didn't – but did he sign the contract itself in any way for the Galveston Project? No, this was the responsibility of Luster, who was the owner of the company. Right. So he didn't represent that it was 8A – No, there was no representations, Judge Elrod, by Colonel Harris in any form or fashion that he was certifying that this was 8A compliant and that it was a condition of payment. If you look at it, for example, from a false claims act or a key temp perspective, there wouldn't even have been a valid key temp here because there's no – Did anyone make that assertion to the SBA? No, Your Honor. Not in the – No one assured the government at all that this was a true minority participation? No, I think it's – the government just expects that to happen, but nobody – there's no – in the bill of particulars that the government turned over documents for, there was no representations or certifications that we are going to be 8A compliant. It's just that the regulations require this participation. Yes. And so what affirmative – but they go forward with this whole enterprise, and they – but they didn't have an obligation to tell the government they weren't participating, so they just – they said it's okay. They didn't have an obligation, but they did let the government know because the packets of information, according to what the government said, the contracting officers, they said that they got the packets of information reflecting zero work, and they still didn't do anything here. So the invoice packets that were part of the brief here reflected zero work. I know the government representatives, the government contracting officers said that we got – we would have expected that backup information, and we got it, and it showed zero work. But the tropical – I'm sorry, the joint venture employees said I didn't mail that out, but I had it available for someone to review. Either way, there's nobody hiding the truth of what's going on here, that there was zero work going on. You wouldn't put a scheme – you wouldn't put documents that were contrary to that scheme and have them readily available for the government? No, you wouldn't put together a package to the government, Your Honor. Exactly, Judge Howard. You wouldn't put a package together saying that the 8A is doing zero work and flying in the face of the government regulations. That's not what a fraudster would do or want to do. He wouldn't want to self-report his own fraud. How did – what did the record show as to how the defendant sought out the minority participant? How did they identify – how did they get together? That's not 100 percent clear from the record, but Luster knew that there was an 8A company out there that was interested in working with them. And Luster engaged Colonel Harris to go out and seek out the 8A participant to assist them in the process. Thank you, Your Honor. Thank you, counsel. Thank you, Your Honor. May it please the Court. I'd first like to go through some of the evidence that established a scheme to defraud and specific intent to defraud, and then address the four defenses that are talked about, the silence defense, the actual disclosure, that Patricia Harris wouldn't provide benefits, and then the averaging. You might move that mic. I'm sorry. I'll just try and talk louder. I'm sorry, Your Honors. First, the selection of Tropical itself was part of the scheme to defraud. Tropical was a small concrete construction firm. They were a painting operation, as Colonel Harris described it, to the FBI agent. They were a mom-and-pop operation. Colonel Harris's first proposal was for Luster to provide project managers and for Tropical to do the construction. But she said, my firm's too little for this. And then Harris came back with this project management of these sophisticated projects, and she said, I didn't understand the concept or how we were going to do it. Her background was in hotel management. Her degrees were in human sciences, even though she did some human relations work for a hotel. And they had no experience in the sophisticated and highly technical areas that they were doing, and as the district judge found, they really didn't have the capacity to learn that. Why was it so technical? I thought she just couldn't hire the employees. Well, the technical part of it is evaluating the core of engineers' dredging operations, and the technical part of the net zero are all of these different alternate sources of energy, negotiating with the PUC, using lawyers. Even just looking at the table of contents of the deliverables, you'll see how difficult that is. And if you say, well, Luster could find the people and then she could hire them, but is there any real meaningful management? Is there any meaningful learning in doing something like that? The first set of false representations occurs in the creation of the joint venture agreement. Yes, he didn't sign the joint venture agreement. And no matter who circulated the template for it, Winner's testimony was that it was Harris who came up with the idea that Charles Winners was going to be the program director, the overall in charge, responsible for the overall contract performance. Charles Winners never participated in negotiation. He was never a program director. He was never consulted. He never visited a job site. He never did any work whatsoever. He was a straw man. But Winners came to the contract, right? Ms. Winners gave the template for the contract. She circulated it, yes, from the SBA website. But what I'm saying is it was the defendant who said, who put Charles Winners as the chief, the program director, never did anything. He was a fake program director. Is there evidence in the record that they actually did complete some projects, maybe not these two, but others? Okay, the International Boundaries and Water Commission. There are two sentences in the record about that. One is in the FBI interview, it said in 2000, March of 2013, Colonel Harris said that there was this project. One sentence about it. And then one sentence from Patricia Winners that the project was done. No information about what the project was or whether it was really done. Two sentences about that in the entire record. To answer your question, Judge Elrod, about the contracts, yes. Colonel Harris signed as the exclusive representative of Tropical Luster Joint Venture. He signed the contracts. That's Government Exhibit 29 and Government Exhibit 7. And the box is checked there that this is an 8A joint venture. That's a false representation that this is going to be a bona fide 8A joint venture. And so those two contracts are. Your jury under the indictment had to be persuaded that Harris acted with the requisite intent when he made that representation, correct? I'm sorry. For this conviction to stand, let me state it another way. Wire fraud is a specific intent. Yes, sir. Yes, sir. As I read the jury's charge in this case, that was the instruction to the jury. And so the false representations are what I just discussed about putting a straw man in the joint venture agreement, signing the two contracts that it's an 8A joint venture when it's really not an 8A joint. It's just a sham. It's a pass-through in order to gain access to the government contracts. And those are the only material false representations. Well, you could also say that after doing no work on the Galveston contracts and bringing Patricia Harris out to the Fort Bliss kickoff meeting just to say hello and saying you don't need to stay, you don't need to do anything, you could just go home on the first flight. That's a representation by conduct that Tropical is going to be involved. To whom? And that it's going to be a real joint venture. To whom? How is that a representation? It's a representation to the Fort Bliss people that this is going to be a real joint venture. Here she is. But she was just brought out as a token jester. What was Winter's company? What business were they in? They were in a small-scale construction, concrete construction, and they also did some painting. Give me some more deep facts about small-scale relative to what. I mean, how many employees did she have? What was her annual income? I don't believe she had any employees. Her husband was the concrete guy, and she was the president of Tropical. The minority company had no employees? Not for the course of these two contracts. I don't know whether they ever. I assume when they're doing a contract work, they'll subcontract and. . . Sub it out. They would sub it out. They would sub it out, exactly. And they could have subbed out these deals, right? She just didn't want to. Well. . . Isn't that what the facts show? The 8A is supposed to be in charge of the operation. But you can be in charge and sub out. I mean, that's. . . You could be in charge and sub out if you're actually directing the project. The sophistication of these projects was such that she had no idea what was going on. Hadn't she been in the hotel industry in addition to the construction industry? Exactly. I said that she had been in the Omni Hotel in the human relations business. Supervising people. Yes. I'm not clear how he had, the defendant, identified this particular minority enterprise. Well. . . On the record. What does the record tell us about that? How did he locate a minority enterprise? Obviously, he wanted to partner with one to get the benefits of that program. Actually, the first contact was someone said you ought to call this person. And the first contact was Charles Winters talking to Colonel Harris. And that's how they knew about each other. And then, as I said, Harris came to them and said. . . You can be a minority contractor and you can get this business. Yes. And then he also was saying I have a lot of contacts. I can get this business. So what is the evidence that at the time you say the representations were made, Harris knew it was false? Yes. He might have been negligent, but where's evidence of falsity?  Do a joint venture for IT work. You can have a dog walking service do reports about nuclear submarines. Her experience was just as a mom and pop operation for concrete construction and painting, wasn't anything close to what was being done. This is El Paso? Yes. Well, Fort Bliss was the second. A contractor coming out of Fort Bliss. And then you also have the evidence that in the interview of the FBI agent after a series of questions when they did no. . . Tropical did no work, is that right? Yes, they did no work. And so he said it appears that Luster was gaining access to 8A sole source contracts by using tropical status. And he said when you put it like that, I'm guilty as charged. But that's not it. It's something that's indicative of his state of mind. Also indicative of his state of mind is when he says we're trying to make it look like we're in compliance, not that we're trying to be in compliance, but we're trying to make it look like we're in compliance. On the defense of the silence and duty to speak. . . Where was the wire fraud? The wire fraud comes for each of the 16 payments for the two projects. There was a stipulation according to the indictment. . . That they passed in interstate commerce. Okay. And one was from Tennessee. . . I remember. I forget where the other one was from. The silence for the duty to speak really comes from as a timing argument. They say because of the not guilty. . . There was one not guilty verdict for the first payment. And because of the not guilty verdict for the first payment, then the argument is that the jury must have believed he formed the intent to defraud after the joint venture agreement. But a not guilty verdict on one count has no bearing on the other counts because. . . What would be the explanation, though? Well, the explanation for how a jury reaches compromises and comes up with it, I couldn't. . . Because there is evidence, contemporaneous evidence, that he was constantly seeking or frequently seeking clarification. Is this okay? Does it have to be 40 percent over the lifetime? I have a theory. What is your theory? My theory is because he didn't sign the first Galveston contract, but he did sign the second Galveston contract and the Fort Booth contract, that that was it. So it's based on the signing of the contract. But that's my speculation. I'm sorry, I'm just completely. . . If it were not clear that. . . I understand your position is that it's from the very beginning and so it's not contract specific. But if it was not clear as to one particular contract, would we have to send it back for re-sentencing? Yeah, I think you would. But it was a huge, the court calls it a downward departure, but it was a variance from like 57 to 87 or 51 to 87. He got 24 months on a huge downward variance. And I'd like to make the argument that he would have gotten the same sentence anyway, but the court doesn't say. . . That was standing in the guidelines. I have problems with the sentencing in this case. Why shouldn't we send that back for him to get to the proper sentencing range? Do you have a real answer to that? Well, I think the sentencing range was correct. Are you going into the. . . It depends on what your theory is of loss. I mean, it's not the guidelines. What is the government's theory of what the loss here is? Oh, yeah. Well. . . Gain or either way. Right. And just parenthetically, Judge, you asked about profits. It was about $110,000. It was about $110,000 profits for each one. Yeah. But, yeah, we would be relying on Maxwell, the Maxwell case. And in that case, they said, well, in these government benefit programs, affirmative action programs, the emphasis is not on what work is being done but who is doing the work. And where there was fraud in Maxwell, they said the contractor who, even though he completed a project, got the contract by fraud, none of that or all of that counts because he's an unintended recipient. And the minority contractor who did no work, that's an unintended recipient also. And here, Luster was an unintended recipient. There shouldn't be contract money for a company that attained the contract by fraud. There was no. . . What's the government's position? Do you take the position that the contract should never have been awarded at all, that all the money is paid out as the loss? Yes. And the final argument or the final analysis was that this was just a pass-through. And Maxwell talks about pass-through operations. It was just a vehicle to obtain the government contract. But they could get the contract anyway, though. No, they could not. It's set aside for minority. . . I thought there was evidence in the record that they didn't have to do the. . . I thought there was some evidence in the record. Well, it's a minority pass-through contract. Luster has no ability. . . But, no, that they could have gotten the job somehow. There's no evidence in the record. No, I don't believe there's any evidence in the record. It's exclusively a small business set-aside contract. But there was work done. The labor was done. Exactly. So that's why I'm saying. . . It seems to me the loss would be under the generous amount, not the zero amount or whatever that they're asking for. It would be 40% of the 1.3, because the work was done. And so it wouldn't be 100% of 1.3. That's exactly the arguments that were made in Maxwell and exactly the arguments that were made in Blanchett. And that's what the court found. Well, the Maxwell court said that the loss should be 100%. The Blanchett court said the loss should be 100%. The portion of the contract price the government would have anticipated but was retained by the 8A firm that performed no work. That's what seems. . . That's the Brothers construction and. . . That's Brothers construction, right. I was talking about Maxwell and Blanchett. But Maxwell does that, too. Maxwell says the loss should be 100% of the contract. Okay. If we did it, if we followed Brothers, would we have to send this back for re-sentencing? Again, if it's not 16 levels, you wouldn't have had a correct guideline range. Okay, so is the answer yes? The answer is yes. Okay. The answer is yes because. . . We don't like that theory. The answer is yes because he didn't say, I would have given this downward variance, this sentence anyway. Well, we're open to pick any one of these theories of how to calculate because we don't have settled precedent that requires us to go with one. That is exactly correct. And there are different methods used by the different circuits, and so we're trying to pick the best one. And we need to do it right in this case because we have. . . This is our first time to articulate it in perhaps. . . Perhaps in a published case, perhaps. Well, the government benefits rule talks about unintended recipients, right? If you're an unintended recipient, all that loss is counted. Now, how is Luster an intended recipient when it wasn't a real joint venture and they wouldn't have gotten the contract if there was no work done by Tropical? And then, obviously, the 8A company that does no work is an unintended recipient. But there's some quantum merit value in the work, though, isn't there? Well. . . I mean, seriously, they got some benefit. Right, and if you look at the guidelines on a standard contract, subtract what the government actually gets, that's the way it's done. But if you look at Maxwell, you look at those other cases, they're saying this is different because it's not the work that's getting done that's important, it's who is doing the work that's important on these affirmative action contracts. And here, the government was deprived of the ability of the minority contractor to do any work on the contract. Well, some minority contractor out there was deprived of the opportunity to actually participate. To actually learn something. That's part of the theory. The winners were never brought to the job site. They were never asked to learn anything. They were just treated as a shell company, as a fake company, as a pass-through company. And so we would ask that the conviction be affirmed and the sentence be affirmed. Can we do anything about the fact that the text of the rule doesn't really apply? Well, okay. The text of the rule, though, does say . . . The upshot of Maxwell and Blanchett is that affirmative action programs are that third one. Where is it? Entitlement payments. The upshot of Blanchett and Maxwell are that these affirmative action programs are within those three because they're entitlement payments. Why are they entitlements? Because they're affirmative action programs. Okay. Thank you. May it please the Court. Your Honors, I'd like to address briefly the government's points. First, the government makes the point that Tropical lacked the capacity from the very beginning to hire its employees. That this was a mom-and-pop operation and that Patricia Winters didn't know what she was doing when she signed the TLJV agreement. But if that's truly the case, then the SVA failed to do its job at the very beginning. The SVA knew back in February 2009 exactly what Tropical was capable of doing. In February 2009, Patricia Winters went to the SVA and had her company certified as an 8-8 entity. A year and a half later, she's going back to the SVA seeking joint ventures. And so in July 2010, she has three joint ventures under her belt. Three all in the same week, two on the same day. And Patricia Winters is the one who wanted the 8-8 status. She went to Deborah D'Amando and had several meetings. I have a question. How does it help this defendant that she's lying too? Well, it shows that the government's argument that this was some sort of fiction created at Colonel Harris's behest. The question is what the jury can conclude. Why can't the jury reasonably conclude? It doesn't help this defendant that she's just a participant in the scheme. Maybe they should have charged her, too, but that doesn't help this defendant. In other words, those representations are not that she would—she wasn't performing on those contracts. So if she made those representations, she just lied. She may have lied, and she may have lied to all of the parties, but when the parties executed the TLJ agreement, Colonel Harris was under the reasonable belief that she was going to meet her contractual and statutory duty to hire employees to meet her 40 percent labor agreement. And when she started the TLJV, they had one of the contracts— That's his defense. I understand that. My question is why couldn't a jury on this record choose, as it apparently did, to not believe that? Because there is insufficient evidence to impose criminal accountability on Colonel Harris for the SBA failing to do its job. Conclusion. But I mean, I understand that that would be—if that's so, then you win. That doesn't answer the question, though, given the facts that are outlined here, why a jury can't conclude this with a sham from jump start. Your Honor, I don't know why the jury came to its conclusion. It is odd, though, that one count was not guilty and all the rest were guilty. What we do know, though, is what was Colonel Harris's legal obligation under the TLJV agreement, and what was he statutorily obligated to do since he was designated as the project manager? And several government witnesses testified again and again that Colonel Harris, under the TLJV agreement, was not responsible for reporting Tropical's failure to do its job. And he was reassured again and again and again that it could happen over the life of the contract. And so the government's position that Tropical was not this construction management firm, it was a construction firm that only dealt with painting, with no experience, that's completely irrelevant. The whole point of the joint venture is for an 8A entity to get experience so that it can continue to get different job experiences that it otherwise wouldn't have that opportunity to do. The only way you can get a JV is if the 8A company lacks the capacity to do it on its own. And so Jose Campos, who was a 29-year veteran under the SBA, testified that the goal of the company is to get experience so that hopefully the company can do it on their own the next time around. It's very natural for a construction company to want to do construction management. It's not some sort of janitorial-type work doing construction for the very first time. This was a company that perhaps didn't have a lot of employees, but they were proficient in hiring qualified subcontractors who could do that type of work, and that's exactly what they did. It's really baffling to me if he's constantly seeking assurances that it's okay that they're not doing their 40% at this present time. Why he'd be going to the government saying, are you sure we're going to anyone and seeking clarification on this if he's scheming from the get-go? But at the same time, we do have this jury verdict, and I can't figure out, was there something? I can't figure out why the jury, why they did what they did. Do you have any insights on this? Was there some turning point in the trial? I tried to read a number of this, and I can't figure out what happened. I don't know, Your Honor. I'm not sure. I can't answer for the jury, but I do know that over and over again when the contract was going on, he attempted to get Patricia Winters to hire her employees, and again and again she said before the Galveston contract even started that she was ready to go, and that's in Defense Exhibit 66, 68, 69. We're ready to go. I'm ready to go. I have all the updated information. Here's my package of benefits. And then as the contract proceeds, she drops the ball. She doesn't want to do it because it's going to compromise her HUBZone status, and he goes to his superior, Robert Lusser, who's the president of the company. He goes to Eric Millett, who has SBA training, and they all reassure him that they can do this over the life of the contract, but the contract was cut short prematurely before they were able to complete it. Thank you, counsel. Thank you.